UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA        )
                                )
        v.                      )
                                )
FREDERICK SIMONE,               )    Cr. No. 03-10356-MLW
VINCENT GIOACCHINI and          )
FRANCIS WHITE,                  )
                                )
            Defendants.         )
```

MEMORANDUM AND ORDER

WOLF, D.J.                                    March 29, 2004

I.    SUMMARY

On January 16, 2004, Magistrate Judge Joyce London Alexander issued a nine-page Order on Detention directing that defendants Frederick Simone and Vincent Gioacchini be detained pending trial because, she found, no combination of conditions of release would reasonably assure the appearance of the defendants at trial and the safety of the community. Simone and Gioacchini each appealed this decision.

This court conducted an evidentiary hearing on February 24, 2004 and has independently reviewed the Magistrate Judge's decision. This court finds that the government has failed to prove that if released on certain familiar and feasible conditions, including electronic monitoring, either Simone or Gioacchini is likely to flee or to be a danger to any individual or the community.

The reasons for these decisions are described in detail below.

In essence, they are rooted in the unusual posture of this case. The RICO and related charges against Simone and Gioacchini are based on electronic surveillance conducted by the Massachusetts State Police from September to December 2000. As a result of that electronic surveillance, in December 2000 Simone was charged in state court with committing certain crimes relating to firearms. In February 2001, Gioacchini was charged in state court with possessing a firearm. Each of these cases, which have not yet been tried, involves a lengthy potential prison term. Simone and Gioacchini were each released on bail. They have since been subject to further investigation. Each has long known that he could also be charged in a federal case.

Nevertheless, neither Simone nor Gioacchini has fled. Rather, they have regularly appeared as required by the state court in the pending cases against them. This is consistent with their respective conduct in other cases. Gioacchini obeyed the conditions imposed when this court released him on bail in 1990 and self-reported to serve his sentence after pleading guilty. Similarly, in 1987, the state court gave Simone about three months to self-report to serve a 15 to 20 year sentence and he did so.

In addition, although the government has been investigating Simone and Gioacchini since their release on the state charges, it acknowledged at the February 24, 2004 hearing that it has no

evidence that either of them has committed any crime since 2001.[1] Although Simone and Gioacchini believe that they have identified informants against them and have long known of the alleged victims who might testify in this case, there is no evidence that they have tried to intimidate or harm any of them.

Simone and Gioacchini were inducted as members of the Patriarca Family of La Cosa Nostra (the "LCN" or "Mafia") many years ago. Courts, including this court, have previously found that membership in the LCN weighs in favor of detention, but cannot be the end of the inquiry. See United States v. Patriarca, 948 F.2d 789, 794 (1st Cir. 1991); United States v. DiGiacomo, 746 F. Supp. 1176, 1182 (D. Mass. 1990). Rather, "'[d]etention decisions must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant.'" Patriarca, 948 F.2d at 794 (quoting United States v. Tortora, 922 F.2d 880, 888 (1st Cir. 1990)).

The evidence in this case depicts an LCN Family – now characterized by the government as the "New England LCN Family" – that has been substantially diminished, if not decimated, and is in disarray. The electronic surveillance indicates that in 2000 Gioacchini and Simone were being threatened by Anthony "Spucky" Spagnolo, a Family member and one of Gioacchini's former

_____

[1]However, as discussed infra, it appears that Simone hit his girlfriend, Pamela Harris-Daley, in 2002. However, she denies that this occurred.

codefendants. They believed that Spagnolo's threats were sanctioned by the hierarchy of the remnant of the Patriarca Family and were intercepted making disparaging remarks about alleged Underboss "Sonny Boy" Rizzo, among other Family members. In these circumstances, it is not proven that the LCN would assist Simone or Gioacchini if, contrary to this court's conclusion, they tried to flee or endanger those providing information or evidence concerning them.

The court finds that the conditions of release that include electronic monitoring and the potential forfeiture of certain property will provide reasonable assurances that neither Simone nor Gioacchini will flee or present a danger if released pending trial. They are, therefore, being released on those conditions.


II.  THE APPLICABLE STANDARDS

It is necessary to consider the pretrial detention of Simone and Gioacchini because each is charged with crimes of violence within the meaning of 18 U.S.C. §3142(f)(1)(A). The charges against Simone include alleged violations of 18 U.S.C. §1962 ("RICO"), 18 U.S.C. §1951 ("Hobbs Act" extortion), 18 U.S.C. §892 (extortionate extension of credit) and 18 U.S.C. §894 (collection of extortionate extension of credit). Pretrial detention must be considered for Gioacchini because he faces RICO and Hobbs Act extortion charges, among others. As the government acknowledged at the February 24,

4

2004 hearing, the charges against Simone and Gioacchini do not invoke the rebuttable presumption favoring detention established in certain circumstances by 18 U.S.C. §3142(e).

In reviewing the magistrate judge's detention orders, the court must undertake an independent review, giving her decision such deference as the care and consideration manifested by the magistrate judge warrant. Tortora, 922 F.2d at 882-83; United States v. O'Brien, 895 F.2d 810, 816 (1st Cir. 1990); DiGiacomo, 746 F.Supp. at 1181. In this case that deference is limited because the magistrate judge did not properly consider the weight of the evidence and, particularly, did not in her brief and relatively cursory Memorandum address at all the important evidence of the defendants' conduct since they learned in 2000 of the electronic surveillance and potential federal charges against them.

As this court has previously written:

> With regard to the risk of flight as a basis for detention, the government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure each defendant's appearance at future court proceedings. United States v. Vortis, 785 F.2d 327, 328-29 (D.C.Cir.), cert. denied, 479 U.S. 841, 107 S.Ct. 148, 93 L.Ed.2d 89 (1986).

> With regard to danger, however, there is a heightened standard of proof because of "the importance of the interests of the defendant which are implicated in a pretrial detention hearing." S.Rep. No. 225, 98th Cong., 2d Sess. 22, reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3205. Thus, clear and convincing evidence is required to establish the facts relied upon to support a finding that no combination of conditions will reasonably assure the safety of any other person or the community. 18 U.S.C. § 3142(f).

DiGiacomo, 746 F. Supp. at 1181.

"Undoubtedly, the safety of the community can be reasonably assured without being absolutely guaranteed." Tortora, 922 F.2d at 884. "[C]ourts cannot demand more than an 'objectively reasonable assurance of community safety.'" Id. (quoting United States v. Orta, 760 F.2d 887, 891-92 (8th Cir. 1985) (en banc)). Similarly, only reasonable assurances, rather than a guarantee, are required with regard to the risk of flight.

As the First Circuit has recognized:

In determining whether suitable conditions exist[], a judicial officer [is] required to take into account the following: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence as to guilt or innocence; (3) the history and characteristics of the accused, including past conduct; and (4) the nature and gravity of the danger posed by the person's release. See 18 U.S.C. § 3142(g). Danger, in this context, was not meant to refer only to the risk of physical violence. See S.Rep. No. 225, supra, 1984 U.S.Code Cong. & Admin. News at 3195.

Tortora, 922 F.2d at 884.

Thus, giving due deference to the decision of the magistrate judge, the court must determine first if each defendant has been properly classified as dangerous and also as an undue risk of flight. Id. at 885. If so, the court must evaluate the contemplated conditions of release to determine whether the public safety and the appearance of each defendant will be reasonably assured if he is released on those conditions. Id. at 886.

6

III. THE STATE INVESTIGATION AND PROSECUTIONS
     OF SIMONE AND GIOACCHINI

The affidavit and testimony of the government's sole witness before the magistrate judge and this court, Massachusetts State Police Detective Lieutenant John Tutungian, and the information provided by the defendants proves the following.

Simone and Gioacchini were each inducted as members of the Patriarca Family many years ago and have been close associates. In 1987, Simone admitted that he participated in the murder of Angelo Patrizzi, was released on bail, and later reported as required to serve a 15 to 20 year sentence.

In 1990, Gioacchini was charged with gambling offenses and two alleged extortionate extension of credit, or "loan sharking," crimes for which it was claimed that he earned a total of $325 in interest between 1980 and 1984. The charges against Gioacchini and his codefendants, Biagio DiGiacomo and Spagnolo, arose from an undercover operation conducted by the Federal Bureau of Investigation ("FBI"). Gioacchini learned in 1986 that he was the successful target of that investigation and that he was likely to be indicted. He did not flee. Nor did he seek to threaten or harm the FBI undercover agent, Vincent delaMontaigne, or anyone else.

Gioacchini was released on bail by this court. See Aug. 7, 1990 Memorandum and Order in United States v. Gioacchini, et al., Cr. No. 90-10065-WF (Ex. 1 at Feb. 24, 2004 hearing) (the "1990 Gioacchini Memorandum"). There is no evidence that he violated any

7

of the conditions of his release before pleading guilty. Gioacchini was sentenced to serve 57 months in prison and permitted to self-report to the institution designated by the Attorney General. He did so.

By 2000, Simone and Gioacchini had been released and had engaged the interest of the Massachusetts State Police, which obtained state court orders to conduct electronic surveillance of them from September to December 2000. The electronic surveillance demonstrated that neither Simone nor Gioacchini was in good standing with the remnant of the Patriarca Family that remains after several decades of successful prosecutions. See, e.g., United States v. Angiulo 897 F.2d 1169 (1st Cir. 1990); United States v. Carrozza, 807 F. Supp. 156, 164 (D. Mass. 1992), rev. in part, United States v. Carrozza, 4 F.3d 70 (1st Cir. 1993); United States v. Patriarca, 912 F. Supp. 596, 610-14 (D. Mass. 1995); United States v. Salemme, 91 F. Supp. 2d 141, 269-300 (D. Mass. 1999), rev'd in part on other grounds, sub nom. United States v. Flemmi, 225 F.3d 78 (1st Cir. 2000).

Gioacchini was legitimately employed as a waterproofer and laborer. He also had two bookmakers, Carmine D'Amelio and Joseph Young, paying him "rent" or "protection" money. Gioacchini felt he needed to make $700 to $1000 per month to support his wife and daughter. However, Spagnolo, his former colleague in the extinct DiGiacomo regime of the Patriarca Family, had taken Gioacchini's

two victims. He was also threatening Gioacchini and, by implication at least, Simone as well.

Simone and Gioacchini discussed this situation often. They believed that Spagnolo's harassment was sanctioned by the hierarchy of the Family.

To protect themselves, Simone and Gioacchini carried guns in the fall of 2000. There is, however, no evidence that they used them for any purpose.

If the Family had been operating in the traditional manner, Simone and Gioacchini would have been in a regime headed by a Boston "capo," or captain, and would have been required to consult their capo about their problems with Spagnolo. However, Simone and Gioacchini sought the aid of Matthew Gugliemetti, a capo in the Rhode Island branch of the Family, in ending the menacing rift with Spagnolo. Gugliemetti agreed to travel to Boston to speak with them about this. Simone and Gioacchini discussed the possibility of killing Gugliemetti if, as they feared, he planned to use the occasion to harm them. Gioacchini also told Simone he would kill Spagnolo and any LCN members supporting him if Spagnolo harmed his family. Simone made similar, threatening statements about what he would do if anyone tried to harm him. There is no evidence, however, that either Gioacchini or Simone acted on this bravado.

They did, however, also seek the assistance of Adolfo Bruno, a member of the Genovese Family of the LCN, in their effort to end

their problems with Spagnolo. Bruno has since been murdered and, therefore, cannot provide any further assistance to Simone or Gioacchini.

Simone and Gioacchini were also trying to monitor a grand jury investigation of their activities. They knew of several witnesses called to testify against them. There is, however, no evidence that they tried to intimidate them or otherwise obstruct the investigation.

While being surveilled, Simone and Gioacchini discussed the possibility that they might be indicted in federal cases, which they knew would involve serious potential sentences without the possibility of parole. Although Gioacchini had a fraudulent driver's license, neither he nor Simone fled.

In December 2000, Simone was charged in a federal information with being a felon in possession of a firearm.  That case was dismissed by the government when it realized that he would get a longer sentence for the counterpart of that offense in state court. Simone was charged in state court later in December 2000, and released on $10,000 bail.  His bail was later raised to $20,000 after Simone allegedly hit his girlfriend, Pamela Harris-Daley.  He has otherwise complied with the conditions of his release, including repeatedly appearing in state court as required in his case.

In December 2000, Gioacchini was charged in an information in

federal court with possession of ammunition. That charge too was dismissed. In February 2001, Gioacchini was charged in state court with being an armed career criminal. He was released on $10,000 bail, which was later reduced to $5000. Gioacchini has regularly appeared as required in his state case.

After 2000, the government continued to investigate Simone and Gioacchini. They understood that they might again be charged in a federal case. They did not flee. Nor does the government have any evidence, other than that concerning Simone's alleged 2002 assault on Harris-Daley, that either of them engaged in criminal activity after the last dates charged for certain alleged conspiracies in the indictment – February 2001 for Gioacchini (Count 8) and June 2001 for Simone (Count 21).

IV.  <u>THE STATUTORY FACTORS</u>

   A.   <u>Simone</u>

In addition to the foregoing information, the evidence relating to Simone concerning the factors that must be considered pursuant to 18 U.S.C. §3142(g) proves the following.

Simone is 53 years old. He has lived in Massachusetts all of his life. Simone was divorced in 1999. His former wife and three of his four children live in Massachusetts.

Simone's former wife, his children, and many other individuals wrote letters to the magistrate judge on Simone's behalf. <u>See</u>

11

Defendant, Frederick A. Simone's Memorandum and Opposition to Government's Motion for Pretrial Detention, Ex. J and K. Among other things, the letters describe a man who is devoted to his children. In 2000, in the midst of divorce proceedings, his now former wife wrote that Simone "would not want to let our son down by taking flight" and offered to post the family home as collateral for Simone's bail. Id., Ex. K. Simone's oldest daughter and her husband, a Marine, describe Simone as extremely supportive. His son-in-law wrote: "I know that [Simone] would never run from his responsibilities. This would be a scar on his honor, show a lack of his courage, and break his enormous commitment to those he loves and those who love him." Id.

Moreover, since about 2001, Simone has been living with Harris-Daley, who is an attorney, and her young son Jackie in the home that Harris-Daley owns in Wakefield, Massachusetts. Harris-Daley states that:

> Freddy loves my son as if he were his own and in many ways has been the "true" father to Jackie; Jackie loves Freddy and freely tells him, "I love you . . . I wish you were my Dad;" Freddy would never jeopardize Jackie's future.

Affidavit of Pamela Harris-Daley (Feb. 25, 2004), ¶33. ("Harris-Daley Aff.").

Simone has little history of legitimate employment. In about 2001, he obtained a job with M & M Iron Co. in Rhode Island. Harris-Daley reports that:

> [O]btaining this job changed Freddy and he was so proud
> of this job and that he was being productive and
> providing financially for Jackie and I. He even put his
> pay check stub on the refrigerator each week for everyone
> to see.

Id. ¶¶8 and 9. The downturn in the economy caused Simone to be laid

off.  Id. at ¶12. Simone then worked on Harris-Daley's home, spent

a great deal of time with Jackie, and looked for other employment.

Id.

The government has not presented any evidence to dispute

Harris-Daley's account of Simone's conduct since 2001 or, with one

exception, to prove that he has committed any crime since being

released on bail in 2000. The record indicates that Simone punched

her in 2002. As Harris-Daley denies that this occurred, the assault

case against Simone was dismissed. However, his bail on the pending

state charge of possessing a firearm was raised to $20,000 as a

result of the alleged assault.

Prior to 1988, Simone had been repeatedly charged with, but

not often convicted of, a variety of serious crimes. In 1988, he

pled guilty and received a 15 to 20 year state sentence for

conspiracy to murder Patrizzi. As described earlier, he reported as

ordered to serve that sentence.

In 1997, while still in prison, Simone was given immunity and

compelled to testify in a civil contempt proceeding conducted by

this court in connection with United States v. Salemme, Cr. No. 94-

10287-MLW. Despite being threatened with being held in contempt

himself, Simone refused to implicate Gioacchini in the matter.

More recently, however, Simone has demonstrated a willingness to obey the law when doing so would not involve being disloyal to someone close to him. In the fall of 2002, Simone's license to drive an automobile had been suspended. The electronic surveillance indicates that Simone obeyed the requirement that he not drive and was regularly arranging to be driven by others.

The indictment charges that Simone engaged in a RICO conspiracy, and in loansharking and extortion on behalf of the alleged Enterprise, the New England LCN Family. Several of the alleged incidents of loansharking and extortion are charged as substantive counts as well as racketeering acts. In addition, Simone is alleged to have engaged in conspiracies to commit loansharking (Count 13) and extortion (Count 3) with Gioacchini and their co-defendant Francis White.[2] Finally, Simone is charged with aiding and abetting Gugliemetti's violations of the Travel Act, 18 U.S.C. §1952 (Counts 12 and 13).

As indicated earlier, the magistrate judge made an error of law in addressing the weight of the evidence against Simone and Gioacchini. More specifically, she wrote:

> "[T]he court looks to the weight of the evidence against the defendants. In that an indictment is extant, probable cause is established by the indictment and the Court need not engage in further probable cause analysis. United States v. Vargas, 804 F.2d 157, 162-63 (1st Cir. 1986).

---

[2]White was released pending trial by the magistrate judge.

Order on Detention at 6. <u>Vargas</u>, however, holds only that "the judicial officer may rely on a grand jury indictment to establish probable cause <u>for the purpose of triggering the rebuttable presumptions in section 3142(e)</u>." <u>Vargas</u>, 804 F.2d at 163 (emphasis added). As described earlier, the rebuttable presumptions established by §3142(e) are not involved in this case. Rather, as the Order of Detention, at 2, recognizes, the government moved for detention pursuant to §3142(f)(1)(A) (crime of violence), §3142(f)(2)(A) (risk of flight), and §3142(f)(2)(B) (risk of intimidation of witnesses and obstruction of justice). There is nothing in this case that relieved the magistrate judge of the responsibility to comply with §3142(g)(2), which expressly states that "[t]he judicial officer shall . . . take into account the available evidence concerning . . . weight of the evidence against the person." Yet she failed to do so.

In seeking Simone's detention, the government relies solely on the conversations intercepted in the fall of 2000 and Tutungian's testimony concerning that electronic surveillance. It has not identified any alleged victim of extortion or loansharking who will testify against Simone. Simone's counsel represents that several of his alleged victims will testify that they were not threatened and did not made any payments to Simone because they feared him.

Simone has moved to suppress the intercepted evidence in state court and both defendants intend to do so in the instant case as

well. Among other things, Simone contends that Vincent Roberto and Michael Dezotell were informants or cooperating witnesses who were misrepresented in the applications for electronic surveillance as targets of the investigation. If true, this would call into question the necessity for that electronic surveillance. In Salemme, when similar allegations were proven with regard to James "Whitey" Bulger and Stephen Flemmi this court granted a motion to suppress and that decision was not appealed. See Salemme, 91 F. Supp. 2d at 351-81. The information now before the court is insufficient to permit a meaningful evaluation of the merits of the forthcoming motion to suppress in this case. For present purposes, the court assumes that the intercepted evidence will be admissible. See Tortora, 922 F.2d at 886; Angiulo, 755 F.2d at 974. However, this is not certain. Thus, there is a question whether the government will be able to prove the charges that depend on that evidence.

The government has not presented any written description of how it believes the intercepted conversations support the particular charges against Simone or Gioacchini. The electronic surveillance did not capture any threats being made by either of them to any alleged victim. The government acknowledges that Tutungian's affidavit and testimony address only the weight of the evidence concerning the RICO and RICO conspiracy charges, and Gugliemetti's travel from Rhode Island, which is the basis for the

16

charges in Counts 10, 11, 12 and 13 that Simone and Gioacchini aided and abetted Travel Act violations.

At this point it appears uncertain whether the government will be able to prove the RICO charges in this case. There is little, if anything, in the intercepted conversations to prove the alleged racketeering acts and related substantive charges, except for the racketeering acts relating to the Travel Act counts. For example, Racketeering Acts 3, 4, and 5, and the related Counts 4, 5, 6, allege that Simone extorted, or aided and abetted the extortion of, Chris Kotsiopolous, Michael Dezotell, and Robert Ciolfi respectively. The government has, however, submitted no evidence supporting those charges.

Moreover, even if the crimes relating to extortion and loansharking can be established, there is an evident issue of whether they can be proven to be part of the conduct of business of the New England LCN Family as is required to prove a RICO charge. See 3 L. Sand, J. Siffert, W. Loughlin & S. Reiss, <u>Modern Federal Jury Instructions</u> ¶52.04 at 52-25 (2000);[3] <u>United States v. Boylan</u>,

_____

[3] 3 L. Sand, J. Siffert, W. Loughlin & S. Reiss, <u>Modern Federal Jury Instructions</u> ¶52.04 at 52-25 (2000) states, in part:

In addition to proving that the defendant played some part in the operation or management of the enterprise, the government must also prove that there is some meaningful connection between the defendant's illegal acts and the affairs of the enterprise. To satisfy this part of the element, the government must establish either (1) that the defendant's position in the enterprise facilitated his commission of those illegal

898 F.2d 230, 241 (1st Cir. 1990). As described earlier, the electronic surveillance depicts the remnant of the Patriarca Family in disarray. At this point, there is no evidence that anyone paid Simone or Gioacchini because he was perceived to be associated with the LCN.  There is also no evidence that any criminal activity by Simone or Gioacchini was being sanctioned or directed by any other member of the Family. Nor is there any evidence that Simone or Gioacchini were sharing the proceeds of any criminal activity with any other member of the Family. Alleged New England LCN Family capo Gugliemetti was asked by Simone and Gioacchini to assist in ending Spagnolo's threats to them. However, Bruno, an alleged member of another criminal enterprise, the Genovese Family, was asked to help as well.

In any event, the government contends that the Guideline range for Simone's sentence will be either 110 to 137 prior to trial or 151 to 188 months if he is convicted after a trial. Simone questions these calculations. As described earlier, the evidence presented to date suggests that Simone's conviction is not certain, thus diminishing any incentive he might have to flee.

B.   Gioacchini

_____

acts and that the racketeering acts had some impact or effect on the enterprise, or (2) that the acts were in some way related to the affairs of the enterprise, or (3) that the defendant was able to commit the acts by virtue of his position or involvement in the affairs of the enterprise.

18

In addition to the information in §§III and IV, _supra_, the evidence relating to Gioacchini concerning the factors that must be considered pursuant to 18 U.S.C. §3142(g) establishes the following.

Gioacchini is 53 years old. He too has lived in Massachusetts all of his life. There is no evidence that he has ever traveled outside the United States or, indeed, outside of Massachusetts.

Gioacchini lives with his wife and daughter. In 2000 he was regularly working as a waterproofer and laborer. He also supplemented his legitimate income by extorting "rent" from two bookmakers until he lost them to Spagnolo.

Prior to pleading guilty in the case before this court in 1990, Gioacchini had a record of arrests, most of which appear related to the use of alcohol. The most serious charges against him, assault and battery and possession of a marijuana cigarette, were each dismissed. There is no indication that Gioacchini ever failed to appear as required in court. Nor did any of his convictions before 1990 result in his incarceration.

In 1991, this court sentenced Gioacchini to serve 57 months in prison. He self-reported, served that sentence, and later successfully completed 30 months of Supervised Release. Compare Tortora, 922 F.2d at 886 ("Tortora's criminal activities persisted . . . even while he was on supervised release").

The issues that diminish the weight of the evidence against

Simone also exist with regard to Gioacchini. As described earlier, The electronic surveillance will be subject to a motion to suppress. It includes intercepted conversations in which Gioacchini discusses having collected rent from D'Amelio and Young. However, the government has neither provided evidence from D'Amelio or Young nor represented that it expects that they will testify against Gioacchini. D'Amelio is Mrs. Gioacchini's cousin and, therefore, may be reluctant to do so.

In any event, in view of the fact that Gioacchini lost D'Amelio and Young to Spagnolo, it may be difficult for the government to prove that the alleged extortions of them was part of the conduct of the business of the LCN Family to which both Spagnolo and Gioacchini belong. The charges of aiding and abetting Gugliemetti's alleged violations of the Travel Act may be the strongest against Gioacchini.

Once again, there is no evidence that Gioacchini has done anything to threaten or harm D'Amelio, Young, or the individuals that he has long believed informed against him, Dezotell and Roberto. Nor has Gioacchini fled in the more than three years that he has been subject to state charges and anticipating possible additional federal charges.

The government suggests that the Guideline range for Gioacchini's sentence would be 70-87 months if he pled guilty or 97-121 months if he was tried and convicted on all charges.

20

Gioacchini's counsel argues that the Guideline range for his potential sentence is about 48 months.

V.    ANALYSIS

The government has not proven by a preponderance of the evidence that the conditions described below will not reasonably assure Simone and Gioacchini's appearance in this case. Nor has it proven by clear and convincing evidence that either will be a danger if released on those conditions.

Simone has long been rooted in this community. He now has strong ties to Daley-Harris and her son Jackie, as well as to his own children. The court is not persuaded that he is likely to jeopardize the property that Daley-Harris is pledging to secure his release and Jackie's opportunity to continue to live in Wakefield by fleeing or endangering anyone or the community while released pending trial. Simone has not fled from the state charges that have been pending against him for more than three years, or presented a danger to potential witnesses or the community while released pending his trial on those charges. This is compelling evidence that he is not likely to flee or present any such danger if released in this case as well.

Similarly, Gioacchini has strong family ties to Massachusetts, and a strong incentive not to jeopardize his family's only asset, the property that will be pledged to secure his release. He too

has, for more than three years, not fled from the state charges
against him or committed any crimes while on bail. Nor did he flee
or present any danger when this court released him in 1990.

The court recognizes that both Simone and Gioacchini were made
members of the Patriarca Family of the LCN many years ago. In the
early 1990's, such membership was deemed by the First Circuit and
by this court to be a highly relevant consideration weighing in
favor of detention. See Tortora, 922 F.2d at 885 n.10; Patriarca,
948 F.2d at 795; DiGiacomo, 746 F. Supp. at 1182. Even then,
however, "mention of the Mafia [was] insufficient, in itself, to
carry the day for the government." Patriarca, 948 F.2d at 795. Over
the years, many members of the Patriarca Family have been released
pending trial. See, e.g., DiGiacomo, 746 F. Supp. at 1179
(discussing eight LCN members, including the Underboss, who were
released pending trial in the Connecticut case of United States v.
Bianco, et al.). Gioacchini and his codefendants in the earlier
case before this court have been among the Mafia members who were
not detained. See id.; 1990 Gioacchini Memorandum.

The evidence in this case indicates that the capacity of the
New England Family of the LCN to assist members who might flee or
to facilitate any effort they might be inclined to undertake to
endanger others has diminished significantly in the part two
decades. It is particularly unlikely that the Family would assist
Simone and Gioacchini, who were not effectively protected by the

New England Family from threats by another member, Spagnolo.

The court has considered seriously whether Simone's refusal to obey its order in 1997 to, in effect, implicate Gioacchini in the misconduct then being investigated demonstrates that if Simone is released he is not likely to appear in the future or to refrain from endangering others. Simone's conduct in 1997 demonstrates that he will disobey court orders if necessary to remain loyal to people close to him. However, his loyalty to Gioacchini also suggests that he will be faithful to Harris-Daley and not cause the forfeiture of her home by fleeing or committing crimes if released in this case pending trial. In the context of all of the other relevant circumstances, Simone's disobedience in 1997 is not sufficient to prove that the conditions being imposed on his release will not provide the necessary reasonable assurances.

The conclusion that Simone and Gioacchini are not likely to flee or be dangerous if released on the conditions being imposed is reinforced by the government's conduct since they were initially charged in 2000 and informed of the electronic surveillance on which this case is based. There is no indication that the government only recently obtained the evidence necessary to bring any, let alone all, of the charges in this case. It is evident that the government did not perceive an urgent need to keep Simone or Gioacchini from fleeing or endangering others by charging them with at least some federal offenses after the state court released them

and seeking their detention by the federal court. See DiGiacomo, 746 F. Supp. at 1180. In 1990, this court wrote that, "the fact that the government waited 3 years after the conclusion of its undercover operation to seek the indictment of Gioacchini indicates that the government did not previously perceive Gioacchini to be so dangerous that his prompt incapacitation was a priority." 1990 Gioacchini Memorandum at 5. In this case, once again, the government's conduct undercuts its claim that Simone and Gioacchini each present an unacceptable risk of flight and danger if released.

VII. THE CONDITIONS

The conditions that the court is imposing on Simone and Gioacchini are less stringent than those imposed on DiGiacomo, Spagnolo, and Gioacchini in 1990. See DiGiacomo, 746 F. Supp. at 1189-90; 1990 Gioacchini Memorandum at 15-17. Less stringent conditions are appropriate because although membership in the LCN inherently involves some risk of danger and flight, the court finds that those risks are less than those that existed in 1990 with regard to Gioacchini, DiGiacomo and Spagnolo. Moreover, the evidence in this case indicates that it is appropriate to allow Gioacchini, and perhaps Simone, to work and contribute to the support of his family pending trial.

Simone and Gioacchini are being released on the standard conditions and on the following additional conditions. Each shall

24

remain in his home 24 hours a day, subject to electronic monitoring, except that he may, with the approval of Pretrial Services, leave his home for medical appointments, meetings with counsel, and religious observances, and to work if his employment is approved by Pretrial Services, which may consult the court if any questions concerning the propriety of the proposed employment arise. The property described below shall be forfeited if Simone or Gioacchini flees, or engages in any conduct that endangers another person or the community. See Patriarca, 948 F.2d at 793-94.

Simone's release shall be secured by the pledging and potential forfeiture of Harris-Daley's home at 22 Montrose Avenue, Wakefield, Massachusetts, in which Simone shall reside for the purposes of electronic monitoring. In its February 26, 2004 report, Pretrial Services found that this residence is suitable for electronic monitoring. In addition, it found that Harris-Daley has about $192,657 of equity in her home.

Simone has virtually no assets of his own. Simone, however, has been committed to Harris-Daley for three years and appears to be devoted to her son Jackie. Harris-Daley Aff. ¶¶28, 33. The Wakefield property represents all of Harris-Daley's net worth. Id. at ¶26. More significantly, the loss of her residence would require uprooting Jackie from his home, school, and friends. Id. at ¶¶ 30 and 31. Simone's conduct in the part three years indicates that these foreseeable consequences for Harris-Daley and her son should

overcome any temptation Simone may feel to flee or present a danger to anyone or the community pending trial.

Gioacchini will be required to reside at 192 Cottage Street, Apartment 32, East Boston, Massachusetts, which was the location of his 1990 pretrial release subject to electronic monitoring. In its February 26, 2004 report, Pretrial Services states this residence would again meet all of the criteria for electronic monitoring.

Gioacchini has no assets in his own name. To assure that he does not flee or present any danger pending trial, Mrs. Gioacchini proposes to pledge property located at 15 Frankfurt Street, East Boston, Massachusetts. Mrs. Gioacchini is the trustee of the Lydia Land Trust which owns this property. The Frankfurt Street property appears to represent virtually all of the Gioacchini family's net worth. The electronic surveillance in 2000 revealed Gioacchini's concern for his daughter. Thus, the court concludes that it is reasonably certain that, once again, Gioacchini will not jeopardize her financial security by fleeing or presenting a danger pending trial and thus causing the loss of the family's only asset.

In the early 1990's this court imposed strict limitations on the rights of members of the LCN, including Gioacchini, to communicate with their codefendants, other members of the LCN, and their associates while released pending trial. See DiGiacomo, 746 F. Supp. at 1189-92; Gioacchini, at 16, 18-19. However, it has not been proven that similar conditions are necessary in this case. In

26

view of the burden that monitoring such unnecessary conditions would impose on the limited resources of Pretrial Services, the court does not deem them to be appropriate in this case.

VIII.    ORDER

In view of the foregoing, it is hereby ORDERED that:

1.    The January 16, 2004 Order of Detention concerning Simone and Gioacchini is REVERSED.

2.    Simone and Gioacchini shall each be released pending trial on the standard conditions and on the additional conditions described in §VII hereinabove.


/S/ MARK L. WOLF

UNITED STATES DISTRICT COURT