UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CASE NO. 03-CR-10356-MLW

**UNITED STATES**

**VS.**

**FREDERICK A. SIMONE,**
a/k/a FREDDY, a/k/a
THE NEIGHBOR,

**VINCENT C. GIOCCHINI,**
a/k/a DEE DEE; and

**FRANCIS WHITE, a/k/a**
THE WHITE-HAIRED GUY

# MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO SUPPRESS PHYSICAL EVIDENCE NO. 3
### DERIVED FROM EAVESDROPPING-RECORDING DEVICE (BUG) PLACED AT 32 LOWTHER ROAD, FRAMINGHAM, MASSACHUSETTS

**Facts:**

On September 1, 2000 Trooper Pasquale Russolillo of the Massachusetts State Police sought a warrant permitting electronic interception monitoring and recording of telephonic communications over defendant, Simone's telephone. Subsequently, a request was made to intercept on his cell phone. The warrants were issued and renewed on a number of occasions through November 10, 2000. Interim reports were filed with the issuing magistrate as well as a number of minimization orders.

On October 19, 2000 the investigators sought a warrant to broaden the already extensive electronic surveillance by seeking a warrant authorizing the entry into the defendant's home and surreptitious placement of a "bug" into the same.

In his affidavit submitted in support of the application for permission to forcibly enter Simone's home and secretly place a listening device (bug), Russolillo (the affiant) avers the following;

    1.)    On September 1, 2000 Justice Margot Botsford approved applications for electronic interception of telephonic communications over 508-272-0298 (Simone's cell phone) as well as 508-788-1035 (Simone's home phone).

    2.)    On September 19, 2000 Judge Botsford allowed renewals and extensions of both wiretap warrants.

    3.)    On October 4, 2000 Judge Botsford allowed additional extensions.

    4.)    The applications as well as affidavits submitted by Russolillo on September 1, September 10 and October 4, 2000 were referred to as exhibits and "incorporated" by reference.

At the time he requested permission to install the "bug" the electronic surveillance of the cell phone and home phone were actively underway as well as use of pen registers.[1]

On a number of subsequent occasions, Russolillo sought to renew these warrants and requested <u>even more</u> electronic surveillance by placement of the bug in Simone's home (4). He asserts that there is probable cause to believe that the phones are being used by Simone to communicate with named co-conspirators. He also stated that conversations within the home at 32 Lowther Road should be monitored by installation of hidden microphones and other devices after "secret entry" into the home (4). He avers that he has probable cause to believe that the home is "being used for meetings" between Simone and other co-conspirators to "discuss gaming, extortion, loan sharking and usery (5).

The affiant alludes to "statistical phone summaries" (5) to support the observation that "the Simone cell phone is regularly active and conversations between Frederick Simone and others pertaining to criminal activity have been intercepted (6). He further states, "I believe that the intercepted communications evidence continued involvement in an on-going criminal enterprise…" He makes similar claims with regard to Simone's home phone (Simone A).[2] He concludes by stating that the "statistical summary show that …the telephone… is regularly active…with conversations pertaining to criminal activity.

He alleges that Simone uses the telephones to "arrange meetings" at 32 Lowther Road to discuss the various designated offenses (8). In support, he states that a review of tape recorded phone calls reveal that Simone "on a near daily basis…generally uses…(the numbered phones) to communicate with various people related to…the offenses. I note that though these conversations have been cryptic in nature,

---

[1] Numerical references herein are to the page delineations in the Rusalillo affidavit as submitted.
[2] Nowhere in the affidavit does Rusallilo explain what the various numbers and figures mean such as <u>comp</u>, Inc., <u>Pert</u>. It is assumed "pert" means pertinent.

investigators have been able to decipher the true meaning of most of these conversations drawing from their experience and training.[3]

To try and connect the use of the telephones with these "meetings" at 32 Lowther Road, the affiant states that he learned from talking to "made member" Robert Luisi, Jr. that Michael Dezatall is a book maker who meets with Simone "to make rent payments to him." Dezotell made a number of calls to Simone (11). On September 8, 2000 he talked about "tomatoes" which the affiant determined meant a restaurant down the Cape, "Gone Tomatoes." No discussion of Lowther Road or meetings occurred.

On September 12, 2000 Simone appeared "upset" that he did not meet with Dezotell. They arranged to meet on September 13, 2000. Physical surveillance confirmed this meeting. The affiant draws an opinion that because the earlier conversation referred to "Nobska Red," the wine and "that shit" coupled with the fact he entered Simone's house on the 13th empty handed meant that he "made a payment" to Simone (12).

Almost 2 weeks later on September 25th Dezotell called Simone. He says he wants to drop off "that case of wine." They discussed the "Nobska red" and laughed (12). Again, Dezotell was surveilled to Simone's home and exited the vehicle. He had nothing in his hands. The meeting lasted 1 hour (12). On October 6, 2000 Simone calls Dezotell who says that he has "the blueprints" for the house. They agree to meet on October 10 or 11. Based on this, the affiant determines that this is proof of monthly "rent payments" coupled with a weekly loan payment.

The affiant avers that Salvati went to Simone to seek help after being threatened. Salvati related one instance of owing money and being told he owed $5000.00. He related being told "F---- Freddie." Simone calls Nardolillo alleged to be a Rhode Island "enforcer" (15). The affiant then infers that Simone was "reaching out" to Matty Gugliametti through Nardolillo on Salvati's behalf.[4] Salvati told Simone on September 21, 2000 that he was threatened again with additional perjorative comments directed at "that guy you're with" (16).

The affiant then notes that Salvati "meets with " Simone on a regular basis (probably to drive him in his car). Simone suggested a meeting with Salvati at Artie's Restaurant. On October 9, 2000 Dezotell

---

[3] There is literally no indication of who these "investigators" are, no statement of such "training" or "experience." Indeed, Tutungian testified in the detention hearing that he is not an expert on "organized crime." Detention Hearing p.

calls and says that he has more "Nobska red" for Simone (13). The affiant then discusses threats made against Michael Dezotell by "a competing East Boston organized crime faction." He notes (13) on September 27 Dezotell and Simone talked about an "MRI on a leg." Incredibly, the affiant says that it is his opinion that this conversation "concerns threats made against Dezotell for rent/loan/debt payments due (13).

A second call was intercepted that day. It is clear that Joe Salvati was with Simone. Dezotell says that he has not received any "calls" (affiant inserts "threats") and says that the doctor has not called. The affiant opines "doctor" is code for the person who has been threatening Dezotell.

Joseph Salvati is discussed by the affiant. Salvati drives Simone around since Simone lost his license after an OUI arrest in Boston. On September 24, Salvati again complains that he is being harassed and is receiving hang up calls. Simone "sets up a meeting" with Salvati the next day (again, this is certainly not unusual especially since they were friends and Salvati drove Simone while he had no license). On October 12, 2000 four calls were intercepted between Simone and Salvati.

The affiant refers to information received from a state police lieutenant who referred to a nine year old affidavit drawn by an FBI Special Agent in support of a wiretap investigation in which Bruno was a target.[5] The affiant, Russolillo, discusses Mr. Burno's organized crime background based upon the conclusions made in the FBI affidavit with no indication of underlying facts, sources or any indicia of reliability (18). He discusses Bruno's record as well as the "Triple I" Interstate Index (18-19). None of the interesting background has any relevance to the Simone case other than the fact that Bruno apparently spoke to Robert Nardolillo on two occasions.

On October 12, 2000 Salvati called Simone and Simone says to "see what the guy has to say…see if you can drive him up her. We'll eat out here…" They discuss the fact that Simone was "stuck in Framingham." He would rather he come "out here if it's important because I don't want everybody seeing that." He then infers that this means that Simone wants to discuss important matters out of view of law enforcement.

He alleges that Salvati is now an important liaison since anything "you got to say to him you can say to me" (22). Two hours later Salvati calls Simone. Simone says that his home is on the other guy's

---

[4] Nardolillo never called back in response to the pages.

way home.  Simone notes that he (Salvati) could take his car home.  A third call, according to Russolillo, again discussed the threats issue (23).  Nowhere in the conversation is there any reference to threats.  The affiant notes that when Simone says "I'll talk to you when I see you" illustrates that Simone and <u>Salvati use telephones to arrange meetings to discuss criminal acts</u>.

On October 12 a fourth cell was intercepted between Salvati and Simone.  Salvati tells Simone that Bruno wants to meet in Boston as he has to meet with a lawyer.  Simone agrees to meet at Boston Harbor Hotel.  Simone made <u>no</u> incriminating comments.  He was surveilled to the hotel in a black Jeep driven by his girlfriend, Pamela Harris-Daley.  Simone met Bruno at the bar.  They met and talked for an hour and then met an attorney where Bruno gave the attorney a case of wine.  Subsequent "surveillance" was innocuous at best.

Russolillo then details John DeMarco's "connection" to Simone (25).  He states that John DeMarco "collects juice" for White as well as "rent" for Simone according to Luisi.  Simone and DeMarco talk on the phone about his (Simone's) OUI court case.  Simone notes that DeMarco (who apparently also has no car) should call Salvati to get a ride or keys to meet him at his (Simone's home).  On September 25 DeMarco calls Simone to arrange to meet him the next day at Simone's home.  Simone notes that his car is unavailable and they agree to talk in the future.  On September 27 DeMarco and Simone agree to meet at the Boston Harbor Hotel.  Surveillance confirmed this meeting (26).  On September 29 DeMarco calls Simone and says he is going to East Boston the next day.  A subsequent call on October 2 ends up with an agreement to meet at "the cigar bar."  This meeting never occurred.

Russolillo then goes into a detailed account of Robert Nardolillo and his connection to the "Hell's Angels."  Other than a long and rambling account of Nardolillo's background and alleged criminal associations (27) the only relevant conversations with Simone occurred on September 5 when Nardolillo met with Simone on the 6th.  Russolillo determines that this means that Simone is "paying tribute" to Nardolillo for Gugliometti "in exchange for protection and privilege to conduct his extortion, gaming and usury business" (28).

On October 1, 2000 Simone talked to Nardolillo and explained that he did not return the September 20 pages as his pager did not work.  They agreed to meet at 32 Lowther Road.  This meeting

---

[5] This affidavit was not made a part of the exhibits in this submittsion.

never took place. As in prior portions of the affidavit, Russolillo discusses <u>Anthony Musto</u> (29). He rehashes the March 9, 2000 phone call where Musto was "instructed" by Simone to collect "rent" for Simone from Dezotell. He is told to pick up "two ties" (which Russolillo opines means money) at a clothing store.[6]

   Regarding 32 Lowther Road, the affiant states (3) that a conversation between Simone and Musto was intercepted. They agreed to meet at Simone's residence. Surveillance showed that Musto drove his car and parked in the Simone driveway. On September 29, 2000 Simone called one Kevin Keegan (alleged to be a bookmaker/agent for Roberto). Reference is made to an innocuous conversation between Simone and Musto resulting in Musto driving to the defendant's home and parking in the driveway. Musto left 5 minutes later. As a result of this, the affiant opines that Musto is making "rent payments" to Simone on behalf of the "Roberto and Kotsiopolous gaming organizations." He further states that they are "reluctant to discuss matters over the phone but these matters "are addressed openly inside Simone's residence (32).

   The affiant notes that since the issuance of the warrant on October 4, 2000 surveillance reveals that Musto "continues to meet with Simone at his home" (no indication of when). The affiant does note that on October 6, 2000 Musto called Simone and said that he was coming over "right away." Surveillance confirmed his car in the driveway and their presence. There was no indication of when Musto left.

   On October 12, 2000 Kotsiopolous drove to a deli, "Poppy's" located in Framingham. Musto works at Poppy's according to the affiant (32). Kotsiopolous left Poppy's and drove down Route 9 "while using a cell phone."[7]

   The next day on October 13, 2000 Musto called Simone. Musto said he would be over later that day to see him. Surveillance confirmed Musto's car parked in the driveway. At this time Pamela Harris-Daley calls Simone. Again, literally nothing but speculative Russolillo statements are made in a wild and totally unsubstantiated fashion that is indicative of this affidavit. E.g., Russolillo determines that this

---

[6] The affiant again refers to "a call" intercepted in the Essex investigation where Musto describes Simone as "everybody's boss."
[7] Apparently he was not calling Simone as none of the wiretaps or trap trace devices resulted in an intercept. Again, the relevance of this is highly questionable.

evidence "shows" that when Kotsiopolous discovered "Poppy's" was closed he attempted to deliver a rent payment by calling Musto and "gave him the rent payment who, in turn, gave it to Simone the next day.[8]

The affiant then turned his attention to <u>Vincent Roberto</u> (33). He is a "bookmaker who pays rent to Simone" according to the affiant. A search of his home in the Florida raid revealed defendant's telephone number among other names and numbers (34). On October 4, 2000 Roberto called Simone. They talked about Nardolillo's failure to set up a meet on October 4, 2000. Simone and Roberto met at his home at 32 Lowther Road. This was confirmed by surveillance. (That is the only reference to October 4, 2000).

On October 5, 2000 Roberto used Musto's cell phone to call Simone (Russolillo says that this fact corroborates the association Musto has in collecting rent from Roberto for Simone (34). On October 6, 2000 Roberto calls Simone from "Poppy's." They again discuss Nardolillo's failure to meet with Simone. The affiant infers that Simone is "disturbed" and assumes that it was because Nardolillo did not respond that he (Simone) "reached out" to Bruno for assistance. This is another totally wild assumption made by Russolillo with literally no rational basis for the conclusion.

The affiant discusses <u>Francis White</u> (35). He relates the information he received from Luisi, Jr. (36). On October 4, 2000 White called Simone. White tells Simone he will be at "the restaurant." He was surveilled to "The Vault" restaurant. It is almost laughable but that is the only reference to White and Simone. Again, no incriminating evidence, direct or indirect.

The affiant discusses "other notable interceptions" (37). Inter alia, these interceptions of note are;

-Joe Rosato on October 18, 2000[9] calls and Joe says in this conversation that he wants to "meet and talk about something…they have yet to meet and talk…"(37).

Rosato was busted for cocaine and percocets (38).

Attorney Pamela Harris-Daley is then discussed by Russolillo. She is Simone's girlfriend as well as his attorney of record in the Brighton OUI. She was also victimized by the "same people" who harassed Salvati and Dezotell. The Pamela Harris-Daley telephone calls that are recounted are totally irrelevant other than talking about "Havre" St. (sic) and an East Boston exchange.

---

[8] Again there are no photographs, videos or even statements by surveillance officers that show any nefarious or criminal activity. It is all Rusallilo speculation.

The affiant refers to a series of calls on October 17, 20000 regarding Russolillo's opinion that there is an "on-going dispute" with another faction of organized crime (39). Simone, on October 17, 2000 asks Nardolillo "where's the other guy? It's 911" (39). Russolillo infers that Simone is demanding to meet with Gugliametti regarding the threats. On the same date, Salvati calls Simone. Simone tells Salvati that he spoke to a person (who Russolillo states he "believes" is Nardolillo). Later on the 17th Salvati calls Simone who tells him to "call the guy with the zero." (Russolillo assumes this means Bruno)(40).

Salvati calls Simone later on the 17th and "instructs Simone to get a pencil and paper" and gives him a telephone number (401-480-8888). Salvati says go call "our friend" who we "had drinks with." Russolillo assumes Salvati is telling Simone to call Bruno. He also makes a strong, baseless assumption that "based on Salvati's instructions to use a remote telephone" to contact Bruno, this "substantiates the information regarding Bruno's affiliation with the Genovese crime family" (41).

On October 17, 2000 "Matty Gugliometti called Simone on his <u>cell phone</u>. Simone says that he needs to meet him regarding "a problem." Russolillo relates the tenor of the conversation (41-42). Russolillo talks about the various characters involved in these conversations or who were referred to, including "Shaky" Rocco Argenti[10] who is "a Capo affiliated with the Patriaca crime family" according to a corporal on the Rhode Island State Police (again, as is Russolillo's habit, literally no underlying factual basis is set out for the magistrate regarding these sweeping characterizations).

Simone calls Salvati and confirms that he made a call on a remote phone and spoke to an individual who "was with Bruno." Various telephone conversations between Gugliometti and Simone are then discussed with virtually no relevance or connection to Lowther Street (42-44).

Russolillo then literally "writes a novel" with his unsubstantiated speculation and fact-baseless opinions and conclusions regarding the internecine squabble between the various factions (44-45). These conversations involve Salvati, Gugliametti, Simone, Joseph and Zampanti and "Fat Carmen." CI-2 and CI-3 told the affiant and Tutungian that Carment DeNunzio a/k/a "Fat Carmen" the "Rat Kid" the "Fat Guy" contains gambling in Revere.

---

[9] Rusallilo again refers to his baseless conclusory statement in affidavit FS-A/B-3 that "Joe the Rat" Rosato deals Percocets and he pays "juice" to Simone.

[10] He apparently suffers from Parkinson's disease (42).

**<u>Conclusions</u>**

As a result of the above, the affiant concludes that Simone is "upset" about the threats and seeks "intervention" in the matter from "high ranking LCN members." He opines that evidence of the designated offenses "can be obtained by intercepting and recording electronic communications" between Simone and others on his cell phone and home phone. What is most disturbing is the cavalier way that Russolillo tries to expand the scope of this already intrusive electronic surveillance by suggesting that he could obtain evidence of these crimes by intercepting oral communications occurring within the defendant's residence (46).

He proceeds to outline the primary and secondary goals of the investigation (46-47). Incredibly, he acknowledges that;

> **"While sufficient evidence may have been gathered or could be gathered through the use of normal investigative techniques…such a course of action would not result in the identification and apprehension and prosecution of all the participants."** (48).

The affiant acknowledges the further need to "corroborate" Luisi, Jr. who must be weighed in light of his "antagonistic relationship with Simone" (49). Nowhere in this entire 50 page+ submission is there <u>any</u> indication that normal investigative techniques have done <u>anything</u> but deliver success <u>let alone</u> the electronic surveillance that surely was fruitful. There is no basis whatsoever to justify expanding the surveillance to allow placement of a bug in the defendant's home.

The issuing magistrate, Superior Court Judge Margot Botsford, issued this warrant on that day. Three applications for renewal were submitted on October 24, 2000 as well as November 10, 2000 and November 22, 2000.

A review of the affidavits submitted in support of the requested device indicate a clear lack of evidence that normal investigative techniques were tried and failed or were unlikely to succeed. Further, the affidavit does not provide any basis to determine that the defendant's home is being used as a place of criminal activity so as to permit the placement of a "bug" to intercept conversations.

It is certainly no exaggeration to say that electronic eavesdropping looms in our society as the "ultimate invasion of privacy." **Williams, The Wiretapping-Eavesdropping Problem**, 44 Minn. L. Rev.

855 (1960). Only the most precise and rigorous standard of probable cause should justify this sort of an intrusion. **Berger vs. New York**, 388 U.S. 41 (1967), Stewart, J. concurring.

Title III of the 1968 Act prohibits electronic surveillance except under a few strictly limited circumstances. Moreover, state officials may only engage in wiretapping if it is authorized by a state statute that meets the strictures set forth in Title III.[11]

It is clear that Title III prohibits any type of interception of oral communication by the use of any electronic, mechanical or other device. 18 U.S.C. §2515. The affidavit merely refers to a number of people who Russolillo suspected of being involved in criminal activity who visited Simone at his home on a few occasions. There is no factual predicate for an inference that the home was used for a meeting place or common ground or base of criminal activity. Cf. **United States vs. Leisure**, 844 F.2d 1347 (8th Cir. 1988) (probable cause found to place a listening device in a business where physical surveillance confirmed that the locus was, in fact, being used as a common meeting place where targets discussed criminal activities).

The mere allegation of association with a person believed to be involved in illegal activity is not enough to support a finding of probable cause. **United States vs. Johnson**, 539 F.2d 181 (D.DC 1976) citing **United States vs. Martinez**, 498 F.2d 464 (6th Cir. 1974), cert. denied 419 U.S. 1056 (1974). There must be sufficient evidence presented to constitute probable cause to believe that a particular locus or phone will be used by the target in furtherance of the criminal activity. **United States vs. Santana**, 342 F.3d 60 (1st Cir. 2003), cert. denied, 124 S.Ct. 1478 (U.S. 2004).

## II. THE AFFIDAVIT FAILED TO MEET THE CONSTITUTIONALLY REQUIRED STANDARD TO SHOW NECESSITY TO USE THE MOST INTRUSIVE MEANS OF SURVEILLANCE AND FAILED TO SHOW THAT SURVEILLANCE TECHNIQUES EMPLOYED TO DATE WERE NOT SUCCEEDING OR WERE NOT LIKELY TO SUCCEED

To safeguard against the improper use of electronic surveillance the law requires the government to show that normal investigative techniques were unlikely to succeed or would be inadequate. **United**

---

[11] Reference defendant's argument in Motion to Suppress No. 2 that cell phone interception is illegal under M.G.L. Chapter 272 §99. See also M.G.L. Chapter _____ relative to obtaining cell phone and private telephone records without a valid subpoena.

**States vs. Mora**, 623 F. Supp. 354, 361 (D.Mass. 1985), aff'd 821 F.2d 860 (1st Cir. 1987), **United States vs. Canales Gomez**, 358 F.3d 1221 ((9th Cir. 2004).

This rule is a matter of constitutional dimension, not a statutory requirement. **United States vs. Salemme**, 91 F. Supp. 2d 141 (D. Mass. 1999), rev'd in part on other grounds, **United States vs. Flemmi**, 225 F.3d 78 (1st Cir.), cert. denied, 531 U.S. 1170 (2000).

The showing of necessity is constitutionally compelled because the government must persuade the Court that normal methods of investigation are not likely to succeed or would be too dangerous in their implementation. This requirement is akin to proof of "exigent circumstances." Any failure to meet this burden requires suppression. **United States vs. Castillo-Garcia**, 117 F.3d 1179 (10th Cir. 1997).

In his affidavit, the affiant, Russolillo, specifically indicates (p47-50) that;

> "sufficient evidence may have been gathered or could be gathered through the use of normal investigative techniques to arrest and prosecute (the defendant)."

He further notes that this would not result in the "apprehension and prosecution of all the participants" in Simone's organization.

It is clear that this is not a valid reason to seek to increase the level of electronic surveillance to seek permission to break into his home and place a bug therein. A request for surveillance based on speculation that there is a large investigative purpose is not enough.

In **United States vs. Blackmon**, 273 F.3d 1204 (9th Cir. 2001) the Court noted that general conclusory allegations of necessity are inadequate;

> "Their generic nature does not dissipate simply because the government claims a vast investigative purpose…the government may not cast its investigative net so far and wide as to manufacture necessity in all circumstances. Doing so would render the necessity requirement void."

Further, the affidavit makes absolutely no showing that the previous investigative techniques including wiretaps on the home phone and cell phone were anything but productive. The review and restatement by the affiant of the previously submitted factual allegations did nothing to present the Court with "a full and complete statement" that investigative techniques were insufficient or unlikely to succeed. See **United States vs. Mondragon**, 52 F.3d 291 (1995). Merely resubmitting previous affidavits is

insufficient and does not satisfy the necessity requirement.  **United States vs. Barrios**, 994 F.Supp. 1257 (D. Colo. 1998).  There must be a submission of new and constitutionally adequate information in the affidavits.  See **United States vs. Caniero**, 861 F.2d at 1176.

Of significant concern is the intrusive expansion of the electronic surveillance through the breaking and entry into the home with secretive placement of the listening device.  There is no question that this type of surveillance is more invasive than a wiretap.

> "Whether placed in a private area, such as a home, office or similarly enclosed location, a bug can be considerably more intrusive than a wiretap.  It can overhear conversations involving several persons whereas the wiretap is limited to the number of phones connected to a specific wire.  A wiretap is only effective if a particular telephone is used while the bug overhears all conversations within its range."  **J. Carr, The Law of Electronic Surveillance**

Placing a listening device invades the very sanctity of the home.  Placement in a home should be limited to only those narrowly construed cases where it is necessary to accomplish a legitimate law enforcement purpose.  **United States vs. Ford**, 414 F.Supp. 879 (D.DC 1976).  See also **United States vs. Iiland**, 254 F.3d 1264 (10th Cir. 2001) (several investigative techniques used with little success detailed in the affidavit.)  **United States vs. Santiago**, 185 F.Supp. 28, 287 (S.D. NY 2002).

As stated above, what makes the lack of <u>any</u> valid statement that normal techniques are not likely to succeed is the fact that there already was a use of electronic surveillance where admittedly a large number of incriminating conversations were intercepted.  In other words, this investigation already exhausted "normal investigative" techniques and already entered the realm of unusually intrusive techniques that were successful.

In **United States vs. Vanmeter**, 278 F.3d 1156 (10th Cir. 2002) the Court noted that normal investigative techniques include;  1.) standard visual and aural surveillance;  2.) questioning and interrogating witnesses including use of grand juries;  3.) use of search warrants; and  4.) infiltration.

Pen registers and trap and trace devices are normal investigative techniques.  Therefore, it is submitted that this investigation sought to expand its use of unusual techniques that were proven to be successful by <u>further increasing</u> the intrusive use of electronic surveillance with absolutely <u>no</u> valid showing of necessity.

Therefore, all evidence obtained through the use of the bug must be suppressed including all evidence derived therefrom through the use of search warrants issued as a result of affidavits in support of application for electronic surveillance containing evidence obtained therefrom.

    Frederick Simone
    By his attorney


    /s/Kevin J. Reddington, Esq.

    Francis White,
    By his attorney


    /s/ Richard M. Egbert, Esq.


    Vincent C. Giocchini,
    By his attorney


    /s/ Robert George, Esq.