told her that he was "with the FBI." The first time, she states, she was at a dinner with SIMONE and Dezotell in the summer of 2000, and Dezotell had been drinking. The second time, she contends, took place after she asked Dezotell to write a letter of support for SIMONE to receive bail, and Dezotell told her he could not do it because he was with the FBI.

Harris-Daley's affidavits are suspect for a number of reasons.[38] First, as Massachusetts Superior Court Associate Justice Sandra L. Hanlon stated in her opinion denying SIMONE an Amirault and Franks hearing, Harris-Daley's affidavits are based purely on hearsay. Specifically:

> Harris-Daley's assertions regarding Vincent Roberto are based on hearsay. Furthermore, the affidavit offers only that Vincent Roberto's wife, Mimi Roberto, "*believed* that her husband was a rat." The information asserted by Harris-Daley with regard to Michael Dezotell, although based on first-hand knowledge, is vague and speculative. A flippant comment made by Dezotell after consuming alcohol is not sufficient to call into question the reliability of Trooper Russolillo as an affiant.

---

[38]It is worth nothing that Dezotell was not named as a target in the original orders and warrants to intercept wire communications on SIMONE's telephones. He was only named as a target after being intercepted on one of SIMONE's telephones. Thus, following Defendants' logic about Russolillo's masking Dezotell's status, had Dezotell in fact been a CI at the time of the investigation, Russolillo would have named him as a target at the outset, in the First Affidavit. To the extent that Defendants' claim is that Dezotell would actually have been a CW, consensually recording conversations, it would have been not only foolhardy, but dangerous, for the Commonwealth to have directed him toward the targets, with an eye toward providing testimony or wearing a recording device.

May 12, 2004, Findings of Fact, Hamlin, S., Justice of Superior Court, p. 5-6 (A copy is attached for the Court's convenience as Exhibit 4).

Second, Harris-Daley is SIMONE's live-in girlfriend, with an investment in what becomes of SIMONE.[39]

Third, Harris-Daley herself is implicated in criminal activity with SIMONE. For example, she was intercepted during the electronic surveillance on SIMONE's telephones and in his house advising the unemployed SIMONE concerning his potential exposure on federal tax charges in light of his monthly cash deposits of $5,000, which were not reflected on his tax returns. (Search Warrant Affidavit, pp. 25-27). The interceptions also demonstrate her knowledge of SIMONE's illegal activities and her willingness to participate in covering up those activities. As a result, in addition to her potential criminal exposure, she also runs the risk of losing her license to practice law.

Fourth, Harris-Daley's affidavits are inherently unbelievable. That a savvy criminal like SIMONE, who had just spent the last ten years of his life in prison, would continue to interact with, and

---

[39]Harris-Daley's relationship with SIMONE and desire to protect SIMONE are reflected in her May 8, 2002 statement to the police regarding SIMONE's assault on her inside a car in Framingham that day. The police were called to the scene, where a number of witnesses, including Harris-Daley's five-year-old son, reported that SIMONE had hit Harris-Daley in the face ("Mommy got hit in the nose"). Harris-Daley requested that she be allowed to file a report; later that day, she filed an affidavit in which she denied that SIMONE had hit, punched, or pushed her. The police report and affidavit are attached as Exhibit 5 to this consolidated opposition.

discuss and participate in criminal activity with Roberto and Dezotell -- including in his own home -- after being told they were "a rat" and "with the FBI," respectively, is simply absurd. The interceptions bear this out. The intercepted conversations are replete with examples of SIMONE speculating about who is a "rat" or what he will do with anyone he suspects of being against him, and expressing his preoccupation with his own criminal exposure.

Finally, to allow a <u>Franks</u> hearing on the thin, and speculative, showing made by the Defendants here would not only be contrary to the dictates of <u>Franks</u>, and at odds with the presumption of the validity of warrants, but would encourage more of the kind of dangerous fishing expedition engaged in by the Defendants. That fishing expedition is intended to identify the government's organized crime CIs, whether through confirmation that an individual is a CI, or through confirmation that he is not a CI -- confirmation which, for a sophisticated defendant, would reduce the pool of potential CIs to be identified, thereby increasing the chance that the next such attempt to identify CIs will be successful.

**B.     The Contested Facts, Even If True, Are Not Material To The Issuing Judge's Determination Of Necessity.**

Even if Defendants' allegations concerning Roberto and Dezotell were true, the omission of those "facts" from the affidavits would not have negated the necessity for the wiretaps, <u>Franks</u>, 98 U.S. at 172; <u>Santana</u>, 342 F.3d at 66, because CIs, by

definition, will not testify in court.[40]    First Affidavit p. 9;
Indelicato v. United States, 106 F. Supp. 2d 151, 154 (D. Mass.
2000)(alleged omission of confidential informant from warrant
affidavit was not material because CI would not have testified).

Defendants attempt to bolster their arguments by analogizing
the facts of this case to the facts in Salemme I, where this Court
ruled that had the FBI shared information that two of the targets
of electronic surveillance were CIs, the wiretap warrants would not
have issued.    978 F. Supp. 343, 352 (D. Mass. 1997).    In Salemme I,
this Court found substantial evidence that the government knew that
the two primary targets of the investigation -- James Bulger and
Stephen Flemmi -- had been acting as FBI informants because of
extensive media reports documenting the relationship between Bulger
and an FBI agent, which information was corroborated by Flemmi,
Bulger's close friend and co-defendant, who admitted during pre-
trial hearings that both he and Bulger were FBI informants.    Id. at
350-351.

In contrast, Defendants' Motion is based on hearsay evidence
of off-hand remarks that do not support their inferences.    The
facts here are more like those in Indelicato, where the district

---

[40]Russolillo specifically averred that CI-1 through CI-6 were
not willing to testify because of fear of the Defendants.    (See
First Affidavit, p. 40).    In any event, even CWs are not
necessarily certain witnesses.    Luisi, who had been a CW at the
time of the First Affidavit, later violated his plea agreement with
the government, was allowed to withdraw his plea (which had been
taken pursuant to then Fed. R. Crim. P. 11(e)(1)(C)), and was tried
and convicted of drug distribution.    He is no longer available to
the government as a witness.

court found that the defendant's conclusory allegations as to the existence of a CI capable of providing certain information did not rise to the level of "substantial evidence" mandating a <u>Franks</u> hearing. 106 F. Supp. 2d at 160 (distinguishing <u>Salemme</u> where "substantial evidence" existed that government "knew" that wiretap's two prime targets were CIs).

Second, as discussed above, Defendants fail to distinguish between CIs, whose status is based upon their anonymity and who have refused to testify, and CWs, who will permit conversations to be consensually recorded, and who will testify at trial.[41] Although CIs can provide information used to establish probable cause for electronic surveillance, because that information is not necessarily admissible in trial, the failure to identify the existence of CIs in a warrant affidavit is not necessarily material. <u>Compare</u> <u>United States v. Simpson</u>, 813 F.2d 1462, 1472 (9th Cir. 1987) (suppressing wiretap evidence when government failed to disclose existence of testifying confidential source), <u>with</u> <u>Indelicato</u>, 106 F. Supp. 2d at 160 ("government need not have pursued more aggressive ways of persuading reluctant, fearful informants to testify before seeking wiretap authorization"). Here, the issue of whether Roberto and Dezotell were CIs is immaterial to the necessity for electronic surveillance because

---

[41]Under Massachusetts law, a CW may only consensually record a conversation if he or she is named in a <u>Blood</u> warrant. Clearly, then, a CI -- whose status is conditioned on anonymity -- cannot make consensual recordings.

Defendants offer no evidence that either would have agreed to testify at the time of the electronic surveillance, and that testimony would have accomplished the goals of the investigation, which would have obviated the need for the electronic surveillance.

Salemme I is also distinguishable on another ground. The main targets of the investigation in Salemme were Bulger and Flemmi. This Court found that their suspected illegal conduct had been authorized by the FBI in connection with their service as CIs. 978 F. Supp at 352. Here, neither Roberto nor Dezotell were the main targets of the investigation or leaders of an organized crime group; both were merely bookmakers who paid rent to SIMONE. As such, they were unlikely to be aware of the scope of the Defendants' criminal activities and organization.[42]  See Canales Gomez, 358 F.3d at 1226-1227. Therefore, the inference that Roberto's or Dezotell's purported cooperation with the government would have had an impact on the necessity determination is far flimsier than that in Salemme.

The First Circuit has held that there is a substantive difference between omissions and falsehoods with regard to the materiality requirement. Where, as here, Defendants allege that the omission was material, Defendants must show that inclusion of the fact would have prevented the issuing judge from finding

---

[42]The fact that Roberto was named in the warrant affidavit as the head of an illegal gaming organization in Massachusetts does not mean he had access to the higher levels of SIMONE's organization.

74

necessity for issuance of the warrants. United States v. Castillo, 287 F.3d 21, 25 (1st Cir. 2002) (calling this distinction "important"). But, even if Dezotell and Roberto were CIs, their status would not necessarily have negated the finding of necessity. Defendants' submissions provide no support for the conclusion that Dezotell's and Roberto's alleged status as CIs meant they would have agreed to cooperate and testify so as to negate the need for electronic surveillance.

The First Circuit has repeatedly affirmed the denial of Franks hearings on the basis that the substantive materiality requirement was not satisfied, even in cases where false statements or omissions were made in a warrant affidavit. Nelson-Rodriguez, 319 F.3d at 33 (omission of informant's prior drug conviction, though "troubling," was immaterial); United States v. Ranney, 298 F.3d 74, 79 (1st Cir. 2002) (false statement of patent ownership unnecessary for finding of probable cause of fraud); Charles, 213 F.3d at 24 (omission of fact of Trooper's violation of minimization order immaterial to validity of search warrant affidavit); United States v. Parcels of Land, 903 F.2d 36, 47 (1st Cir. 1990)(alleged omissions, falsehoods, and CIs' challenged statements did not negate probable cause finding); United States v. Rumney, 867 F.2d 714, 721 (1st Cir. 1989)(omission of accomplice's criminal record immaterial to probable cause for search of defendant's house). Defendants cannot establish that either that the affidavits contained any false statements or omissions, or that any such

75

purportedly false statement or omission was material. Thus, Defendants' request for a <u>Franks</u> hearing should be denied.

C. **<u>The Giordano Standard For Determining Whether Wiretap Evidence Should Be Suppressed Does Not Determine The Threshold Issue Of Whether An Evidentiary Hearing Is Appropriate</u>**.

Defendants argue that the applicable standard for determining whether this Court should convene an evidentiary hearing on their claims is set forth not in <u>Franks</u>, but in <u>United States v. Giordano</u>, 416 U.S. 505 (1974), where the Supreme Court found that suppression was required for both statutory and constitutional violations of Title III, and rejected the government's argument that suppression was only required for constitutional violations. <u>Id.</u> at 525. Although neither Title III nor <u>Giordano</u> discuss the threshold showing necessary for a suppression hearing, a plain reading of the statute and the case suggests that defendant must allege a facial violation of the statute. Where a sub-facial violation is alleged, as is alleged here, the <u>Franks</u> standard applies, requiring that the defendant make a substantial preliminary showing that a false statement was included in the search warrant affidavit, and that the statement is necessary to the finding of probable cause. <u>Franks v. Delaware</u>, 438 U.S. 154, 172 (1978).

In <u>Giordano</u>, the court held suppression hearings following pre-trial notification by the Government that it intended to use the wiretap evidence, which under 18 U.S.C. §2516(9) requires the

76

Government to submit the wiretap application to the judge.
Clearly, this procedure is designed to allow the judge to examine
the wiretap application for facial violations of the statute, and
to hold suppression hearings if facial violations are found by the
judge or alleged by the defendant.   In Giordano, the wiretap
applications had inaccurately described the official who authorized
the applications.   Giordano, 416 U.S. at 509.

The application of the Giordano standard calls for a close
adherence to the procedures for seeking suppression laid forth in
the statute, although Title III itself does not discuss suppression
hearings.   The statutory grounds for a suppression, however,
suggest that under Giordano, a defendant would have to make a
showing of facial invalidity.   Under 18 U.S.C. §2518(10), a
defendant may move to suppress wiretap evidence on the grounds
that:   (1) it was unlawfully intercepted; (2) the wiretap
application was insufficient on its face; or (3) the interception
was not made in conformity with the order of authorization or
approval.   Where the defendant has moved to suppress evidence on
the basis of the insufficiency of the wiretap application, a plain
reading of the statute suggests that the defendant must allege a
facial violation of the statute.   18 U.S.C. §2518(10)(a)(ii).

Here, Defendants have alleged a sub-facial violation of the
necessity requirement based on speculation that Dezotell and
Roberto were informants rather than targets.   Defendants must
therefore meet the requirement of a substantial preliminary showing

77

under <u>Franks</u>. <u>United States v. Cunningham</u>, 113 F.3d 289, 295 (1st Cir. 1997) ("where ... the warrant [is] facially valid but sought to be impugned by proof of perjury," defendants bear burden of showing agents' intent to deceive).

At the time the Court decided <u>Giordano</u>, the statutory and constitutional standards for suppression were the same because the Supreme Court had not yet found a good faith exception for violations of the Fourth Amendment. After <u>United States v. Leon</u>, 468 U.S. 897 (1984), this Court reasoned in <u>Salemme II</u> that the <u>Giordano</u> standard would require suppression even if the government acted in good faith in filing an affidavit that was "unlawful" under Title III. <u>Salemme II</u>, 91 F. Supp. 2d at 358. The Supreme Court's holding in <u>Giordano</u> that evidence must be suppressed whenever central statutory requirements of Title III are violated applies to those specific requirements for wiretap warrants which, if not satisfied, would render the warrant application facially invalid. <u>Giordano</u>, 416 U.S. at 527. Such statutory requirements are distinct from those codifying the Fourth Amendment, which require a court's sub-facial determination as to their lawfulness.

This Court in <u>Salemme II</u> held that <u>Giordano</u> "require[s] suppression without regard to the reason for the violation if certain statutory provisions of Title III *not rooted* in the requirements of the Fourth Amendment are not satisfied." <u>Salemme II</u>, 91 F. Supp. 2d at 358 (emphasis added). As the <u>Salemme</u> decision clearly states, the necessity requirement is rooted in the

78

Constitution.  Id. at 364.  This Court recognized in Salemme that the closest case on point involved a facially invalid warrant. United States v. Cunningham, 113 F.3d 289 (1st Cir. 1997) (warrant's technical errors facially violated statutory specificity requirement but suppression unnecessary because statutory purpose achieved).  While Cunningham expressly refrained from resolving the issue of whether the Leon good faith exception should be read into Title III, it called Fourth Amendment precedent "highly relevant" in deciding whether a facial violation threatens the central interests protected by the statute.  Id. at 294.

Where the court must make a sub-facial determination as to the warrant's validity, the First Circuit has said that the Franks standard applies.  In Cunningham, the Court determined that the defendant bore the burden of showing "intent" with respect to the knowledge of the officer, "if the warrant were facially valid but sought to be impugned by proof of perjury."  113 F.3d at 295.

Cases decided in the First Circuit since Salemme have applied Giordano to facially invalid warrant applications, and Franks to facially valid warrant applications.  See, e.g., Lopez, 300 F.3d at 56 (holding that unknowing violation of implied Title III requirement to disclose plans to employ civilian monitors did not require suppression).  Although Defendants argue that Giordano applies in this case, they do not cite a single case, other than Salemme, for that proposition.  The Affidavits here were, however, facially valid, and thus it is Franks that applies.

Even if this Court determines that <u>Giordano</u> applies here, a hearing is unwarranted because Defendants' allegations, even if they were credible, are immaterial to the necessity requirement. In <u>Salemme</u>, there was significant evidence that if Flemmi and Bulger were CIs (as they turned out to be), their informant status would negate the necessity for the wiretap. In fact, it was because of their informant status that the FBI knew that Flemmi and Bulger were not engaged in the narcotics crimes that were the subject of the wiretap investigation.

Here, the allegation that Dezotell and Roberto were CIs does not call into question the necessity for electronic surveillance at all. Nothing Defendants allege is inconsistent with Trooper Russolillo's conclusion in the First Affidavit that electronic surveillance was necessary, and Defendants have not alleged, and cannot allege, that, even if Dezotell and Roberto were CIs, they would also have been CWs. In <u>Ashley</u>, the First Circuit held that "the issuing court may properly take into account affirmations which are founded in part upon the experience of specially trained agents," 876 F.2d at 1072, and that "the craftiness and wariness of the intended targets is a significant factor to be considered by the court in its determination of whether to authorize electronic surveillance." <u>Id.</u> at 1073.

At the time of the First Affidavit, Russolillo had been investigating illegal gambling organizations for more than three years. He did so together with MSP Lieutenant Tutungian, who had

more than one decade of experience in this area. Russolillo's assertions in the First Affidavit concerning the futility of persuading SIMONE or his associates to cooperate are based on his training and experience and on SIMONE's reputation as a career criminal who engaged in sophisticated counter-surveillance against the police. Russolillo's statements are precisely the kind of affirmations that meet the necessity requirement.

Should this Court apply the Giordano standard, it must still find that the disputed information is material to the finding of necessity. In Salemme II, this Court wrote that the government must "inform the court of all the *relevant* information that the agencies participating in the investigation possess concerning necessity." 91 F. Supp. 2d at 369 (emphasis added). "Relevant" is synonymous with material. See United States v. Aviles, 170 F.3d 863, 867 (9th Cir. 1999)(wiretap evidence admissible where FBI agent withheld no "material facts" from prosecutor); Salemme II, 91 F. Supp. 2d 373 (citing Aviles for proposition that FBI Agent Ring had obligation to disclose "all information material" to the electronic surveillance application (internal citation omitted)).

This Court also adopted the Franks standard for materiality in Salemme II, 91 F. Supp. 2d at 374 n.81. This standard requires that the defendant show that if the information at issue had not been omitted from the supporting affidavits, the issuing court's determinations would necessarily have been different. See Nelson-Rodriguez, 319 F.3d at 34; Ranney, 298 F.3d at 78 (defendants

81

"failed to make the requisite substantial preliminary showing that absent the false information the affidavit contained insufficient evidence to support a finding of probable cause); United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990)("[o]mitted information that is potentially relevant but not dispositive insufficient to warrant a Franks hearing"); United States v. Reivich, 793 F.2d 957, 962 (8th Cir. 1986).

The omission from the affidavit of the existence of CIs does not satisfy the materiality requirement without a substantial showing that the alleged CIs would have negated the necessity for electronic surveillance. Even when a warrant affidavit failed to disclose that a target of electronic surveillance was in a position to provide substantial information to the police, the First Circuit found no violation of the necessity requirement. See Cole, 807 F.2d at 267 (where warrant application failed to mention investigating officer in affair with defendant's live-in companion). In Cole, the First Circuit affirmed that Franks was the correct standard for suppression for a sub-facial necessity violation of Title III. 807 F.2d at 267. The decision in Cole, however, turned on the immateriality of the omitted information, rather than any intent to deceive on the part of the affiant. Id. at 268.

Accordingly, this Court's determination concerning the need for an evidentiary hearing in this matter should turn on two questions: first, have Defendants alleged a facial violation of the Title III requirements; and if not, have Defendants made a substantial

82

preliminary showing that the warrant affidavit does not satisfy the necessity requirement.

## CONCLUSION

For all of the reasons set forth above, Defendants' Motions should be denied in their entirety without a hearing.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: _____

ERNEST S. DINISCO
HEIDI E. BRIEGER
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon counsel of record a copy of the foregoing document by depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery.

This 3rd day of December, 2004.

_____

ERNEST S. DINISCO
HEIDI E. BRIEGER
ASSISTANT U.S. ATTORNEYS

## TABLE OF CONTENTS

Exhibit 1          Affidavit of Thomas Anderson,
                   Coral Springs, Florida Police Department

Exhibit 2          Affidavit of Pasquale Russolillo,
                   Massachusetts State Police

Exhibit 3          Affidavit of Joseph S. Realmuto,
                   Federal Bureau of Investigation

Exhibit 4          Findings, Rulings and Order of Defendant's
                   Motion for Amral Hearing and Motion for
                   Franks Hearing, Commonwealth v. Simone,
                   Criminal Nos. 2001-49-001 and 002

Exhibit 5          Framingham Police Department Arrest - Custody
                   Report, Frederick Simone